IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 13-cv-02502-CMA-CBS

RHONDA DAILY,

    Plaintiff,

v.

HEWLETT PACKARD COMPANY, and
SEDGWICK CMS, Third-Party Administrator,

    Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' COUNTERCLAIM**

    This ERISA matter is before the Court on Defendants' Motion for Summary Judgment (Doc. # 22.)   Plaintiff suffered disabling injuries in a car accident in 2002, and received short- and long-term disability benefits from her employee benefit plan. Thereafter, Plaintiff received disability benefits from the Social Security Administration, as well as a $750,000 settlement from the third-party tortfeasor, for these same injuries. Because the employee benefits plan provides that employees cannot "double recover," the plan's administrator sought reimbursement from Plaintiff for the overpayments resulting from her social security benefits and the third-party settlement.  However, Plaintiff has failed to repay the employee benefit plan.

    Because Plaintiff cannot demonstrate that the plan administrator abused its discretion in requiring her to reimburse the employee benefits plan, Defendants are

entitled to summary judgment in their favor on both Plaintiff's Complaint and their counterclaim.

## I. **BACKGROUND**[1]

Defendant Hewlett Packard Company (HP) is the sponsor of the Hewlett Packard Disability Benefits Plan ("Plan"), which provides both short-term disability ("STD") and long-term disability ("LTD") benefits to eligible employees. (Doc. # 22-1 at 44.) Defendant Sedgwick Claims Management Services (Sedgwick) is the current claims administrator of the Plan. (*Id.*) Plaintiff Rhonda Daily was employed by Defendant Hewlett Packard ("HP"), and is a current beneficiary under the Plan. (Doc. # 22-1 at 5-6.) Plaintiff has received both STD and LTD benefits under the Plan, and remains eligible for continuing LTD benefits. (*Id.*; *see also* Doc. # 3 at 2.)

The Plan expressly vests Sedgwick with discretionary authority to interpret Plan provisions and to adopt and implement rules and policies in its role as Claims Administrator:

> The Company, in its capacity as the plan administrator, is the named fiduciary which has the discretionary authority to determine eligibility for Plan participation and entitlement to Plan benefits in accordance with the terms of the Plan; except that with respect to the determination of entitlement to Plan benefits (including initial claims and review of appeals), such discretionary authority is delegated to the Claims Administrator, and such Claims Administrator shall perform its services as a named fiduciary. In their discretion, and consistent with their authority hereunder, the Company and the Claims Administrator may adopt rules and regulations under the Plan and interpret the Plan text.

(Doc. # 22-1 at 48.)

---

[1] Unless otherwise noted, the following facts are undisputed and taken from the administrative record, which was attached (at least in part) as an appendix to the Defendants' Motion for Summary Judgment.

2

The Plan provides, in pertinent part, that a Plan participant's benefits may be reduced by any individual or family benefits received by the Social Security Administration:

> Offsets
>
> In determining the actual benefit to be paid under the Plan, a Participant's benefit . . . shall be reduced by . . . any income or payments available to or for the benefit of the Participant or his spouse or child . . . by reason of the Participant's Total Disability or retirement from any of the following sources:
>
> > (i) State, federal, and any foreign government disability benefits including . . . Social Security benefits (primary and family).

(*Id.* at 46.)

The Plan also provides, in pertinent part, that the Plan is entitled to reimbursement by a Plan participant when that participant enters into a settlement with a third party in connection with an event that gave rise to the participant's disability:

> Acts of Third Parties
>
> (i) Reimbursement
>
> > A. Whenever a third party is legally responsible or agrees to compensate the Participant, by settlement, verdict or otherwise, in connection with an occurrence that directly or indirectly gives rise, whether in whole or in part, to the Total Disability of the Participant, the Plan will be entitled to reimbursement as specified in this Section. The Participant . . . must promptly pay to the Plan the full amount received (regardless of how that amount may be characterized and regardless of whether the Participant has been made whole).

(*Id.* at 47.)

Section 11 of the Plan provides, in pertinent part, that a Plan participant is required to repay the Plan where a calculation of benefits results in overpayment:

3

Overpayment

In the event that the calculation of a Participant's benefit under the Plan results in an overpayment to the Participant for any reason, the Participant shall be required to repay such overpayment to the Plan . . . The Company may (but is not required to) make reasonable arrangements with the Participant or his legal representative for the repayment to the Plan for such overpayment, including (but not limited to) the reduction of future benefits under the Plan or the reduction of future pay from the Company.

(*Id.* at 49.)

## A. DAILY'S CLAIM FOR DISABILITY BENEFITS UNDER THE PLAN FOR INJURIES SUSTAINED IN HER 2002 MOTOR VEHICLE ACCIDENT

In April of 2002, Daily was injured in a motor vehicle accident, (*id.* at 27) and she applied for, and received, medical benefits and STD and LTD benefits under the Plan due to the injuries she sustained in this accident, (*id.* at 6).[2] In October of 2004, Daily signed a "Right of Reimbursement" form, which provided that:

The disability plan of your employer may require your employer to collect any duplicate payments that you may receive from different sources for the same illness [or] injury . . . This form confirms your understanding of your employer's right to collect these duplicate payments[.]
. . .

In connection with an illness or injury, I have applied for plan benefits. In return for payment of these benefits, **if the payments for the same illness or injury are received, I acknowledge I am obligated to reimburse the plan, as stated in the plan,** up to 100%, or to the full extent of any net recovery. . . .**The requirement to reimburse the plan applies no matter how the recovery is characterized. . . .**

If I receive a plan benefit greater than I should have been paid, **I understand that my employer or the plan's Claims Processor has the right to collect overpayment as specified in the plan, including but not limited to, the right to reduce future benefit payments.** Lastly,

---
[2] The record shows that Daily had also applied for, and received, for STD benefits in 2001. (Dock. # 22-1 at 5.)

4

> I acknowledge that this agreement is intended to confirm and clarify
> my obligations, and I understand that I am required under the terms
> of the plans to reimburse the plans in accordance with this agreement.

(*Id.* at 38) (emphasis added).

In June of 2009, Daily entered into a settlement agreement with the third party tortfeasor who was responsible for the April 2002 motor vehicle accident. (*Id.* at 27-28.) The gross sum of the settlement was $750,000. (*Id.* at 29.) This amount was allocated as follows: past medical bills ($396,496.00); Medicare reimbursement ($2,141); consideration of Medicare, future medical payments ($30,000); future medical, non-Medicare medical expenses ($50,000); pain and suffering, past, present and future ($125,000.00); permanent physical impairment ($100,000); [Daily's spouse's] loss of care of services and consortium claim ($20,000); and lost future income ($26,362). (*Id.*)

Thereafter, Sedgwick calculated that Daily had been overpaid $23,296.60 in STD and LTD benefits due to her third party settlement. (*Id.* at 27.)

## B. DAILY'S SOCIAL SECURITY DISABILITY BENEFITS

In April of 2005, Daily applied for Social Security Disability benefits. (*Id.* at 7.) That same month, she signed a "Promise to Repay" agreement with the former claims administrator of the Plan:

> I request that VPA, Inc.[3] . . . . advance full Plan benefits to me until the
> earlier of an award of benefits by Social Security or my recovery from
> disability. In consideration of all payments made, I agree . . . [t]o repay
> the [Plan] immediately upon receipt of a social security Disability or
> Retirement Benefit Award, those amounts which were advanced to

---

[3] Defendants note that Plan was drafted in 2003, and Voluntary Plan Administrators ("VPA") was the named Claims Administrator at that time. Sedgwick acquired VPA in 2006; consequently, Sedgwick is the current Claims Administrator of the Plan.

> me and subject to the benefit reduction provision of the plan. . . .
> I fully understand that my failure to observe this Agreement in each
> and every respect may result in the termination of Plan benefits.

(*Id.* at 39.) In June of 2007, the Social Security Administration found that Daily qualified for social security disability benefits and family social security disability benefits with a retroactive date of May 2005. (*Id.* at 7-8). Accordingly, Daily received $28,943.00 in past-due benefits, as well as ongoing benefits. (*Id.*)

Thereafter, Sedgwick recalculated the full amount of benefits due to Daily under the Plan taking into account the social security offset, and determined that she was overpaid $468.75 in STD benefits and $25,104.23 in LTD benefits as a result of her backdated social security benefits award.

**C.  SEDGWICK'S ATTEMPTS TO COLLECT THE SOCIAL SECURITY AND THIRD-PARTY SETTLEMENT OVERPAYMENTS**

In February 2009, Sedgwick notified Daily of the social security-related overpayments in writing and stated that, if she did not reimburse the Plan for these overpayments within 20 days, the Plan would "withhold future benefits in addition to making further attempts to collect the balance due." (*Id.* at 19-20.) Daily did not pay; consequently, Sedgwick began withholding benefits to off-set the amounts already paid to Daily by Social Security. (*Id.* at 31, 35-36.)

In September of 2010, Sedgwick requested that Daily pay the $23,296.60 owed due to the third-party settlement in full and stated that, if this amount were paid in full, it would "apply a future offset against her Long Term Disability claim for the remainder of the settlement amount." (*Id.* at 34.)

6

However, Daily still did not pay, and in March of 2013, Sedgwick wrote to Daily's lawyer. Sedgwick again requested payment in full for Daily's third party settlement and indicated that, with regard to the overpayment due to Daily's social security benefits, it would no longer allow her to reimburse the Plan via reduced monthly benefits:

> In circumstances when a person is unable to immediately reimburse a Social Security overpayment in full and asks for a payment arrangement, **the maximum amount of time that we will grant them to reimburse the overpayment in full is 36 months**. **As Sedgwick has been recovering your client's Family Social Security overpayment from her LTD benefits for over 36 months, we are now requesting that payment arrangements be made so that the remaining Family Social Security overpayment balance is reimbursed to Sedgwick within 1 year**. By April 8, 2013, if reasonable payment arrangements are not made . . . then we will have no alternative other than to take next steps to recover the overpayment.

(*Id.* at 35) (emphasis added).

On April 4, 2013, Sedgwick notified Daily's attorney that it was again demanding repayment of the third-party settlement in full. (*Id.* at 37.) Sedgwick also stated that it would give Daily until April 22, 2013, to make reasonable payment arrangements regarding the amount owed in duplicative family social security benefits, and that the payment would be due within the following year. (*Id.*) It noted that if she did not make such arrangements, Sedgwick would "have no alternative other than to take next steps to recover the overpayment." (*Id.*)

On April 22, 2013, Plaintiff brought suit against Defendants in state court. First, she alleged that the Plan was entitled to repayment only for the portion of the third-party settlement "allocated to lost income," rather than the entire amount, and that Sedgwick's demand for repayment of the remainder of the third-party settlement was "unreasonable, arbitrary and capricious and not permitted under the facts or the Plan

7

language." (Doc. # 3 at 3.) Daily also alleged that Defendants acted arbitrarily and capriciously in demanding that she repay the social security benefits she had received in full, rather than repay them via reduced monthly benefits. (*Id.* at 3-4.) Daily sought a declaration regarding the permissible off-set for her social security benefits and third-party settlement. (*Id.*) Defendants timely removed the case to federal court. In their Answer, Defendants raised a counterclaim alleging Daily's failure to repay the Plan for the amounts she was overpaid as a result of her social security benefits and the third-party settlement. (Doc. # 10 at 12-21.)

## II. STANDARD OF REVIEW

### A. THE SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R Civ. P. 56(a).[4] A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for

---

[4] It bears mention that the Tenth Circuit has held that summary judgment is improper in actions seeking judicial review of an administrative record. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80, 1580 n. 31 (10th Cir. 1994). However, I will apply the traditional summary judgment standard of review to this dispute, as the Tenth Circuit's decision in *Olenhouse* was limited to the review of agency decisions under the Administrative Procedure Act. *Id.* Additionally, that court has recently affirmed district court orders granting summary judgment in ERISA cases – and done so without comment regarding the district court's use of the summary judgment standard. *See, e.g., Fite v. Bayer Corp.*, 554 F. App'x 712, 714 (10th Cir. 2014) (affirming the grant of summary judgment regarding an ERISA claim for denial of benefits). In any case, my decision does not ultimately turn on any issues of disputed fact and my review is entirely confined to the evidence in the administrative record.

8

summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir.1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

B.   **ADMINISTRATIVE DECISIONS UNDER ERISA**

Decisions made by a plan administrator under an ERISA plan are reviewed *de novo*, unless the plan gives the administrator or fiduciary the discretionary authority to determine eligibility for benefits or construe the terms of the plan. *LaAsmar v. Phelps*

*Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 795-96 (10th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  Where an ERISA plan gives an administrator discretionary authority to construe the terms of the plan, however, the court employs a deferential standard of review, asking only "whether the denial of benefits was arbitrary and capricious." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (internal citation omitted).

In the instant case, the Plan explicitly grants Sedgwick the discretionary authority to interpret Plan provisions and to adopt rules and policies in its administration of the Plan.  (Doc. # 22-1 at 48.)  The parties agree that this Court is to apply the arbitrary and capricious standard of review in determining whether Sedgwick erred in making decisions related to Plaintiff's benefits.  Additionally, there is no evidence that Sedgwick is biased or otherwise adversely interested so as to trigger a less deferential standard of review.  *See Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1175 (10th Cir. 2004) (noting that a less deferential standard of review should be applied in proportion to the severity of a conflict of interest).  Specifically, the Plan provides for a separation between the payment of claims (by HP) and the administration of the plan (by Sedgwick), such that Sedgwick has no financial incentive to deny claims.  *See* (Doc. # 22-1 at 43, 45.)  Thus, the arbitrary and capricious standard of review is applicable here.

Under that standard, this Court is limited to determining whether Sedgwick's interpretation of the plan was "reasonable and made in good faith." *Eugene S.*, 663 F.3d at 1130.  The administrator's decision is upheld "so long as it is predicated on

a reasoned basis, and there is no requirement that the basis relied upon be the only logical one or even the superlative one." *Id.* at 1134 (quotations omitted). The reviewing court need only ensure that the decision was "sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on *any* reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (quotations and brackets omitted, emphasis in original). Indicia of arbitrary or capricious decisionmaking include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary. *Eissa v. Aetna Life Ins. Co.*, 479 F. App'x 845, 850-51 (10th Cir. 2012). The Tenth Circuit has specifically noted that the arbitrary or capricious standard is "very restrictive," and "one which would be difficult for any claimant to overcome." *Wagner-Harding v. Farmland Indus. Inc. Employee Ret. Plan*, 26 F. App'x 811, 815 (10th Cir. 2001).

### III. DISCUSSION

**A. DAILY FAILS TO DEMONSTRATE AN ABUSE OF DISCRETION AS TO SEDGWICK'S DEMAND SHE REIMBURSE THE PLAN BASED ON HER THIRD-PARTY SETTLEMENT.**

In her Complaint, Daily alleges that Sedgwick acted arbitrarily and capriciously in offsetting the balance of her $750,000 third-party settlement. (Doc. # 3 at 2.) In particular, she alleges – without authority – that the Plan is entitled to offset only the portion of that settlement that was specifically allocated to "disability income." (*Id.*) This argument patently contradicts the plain language of the Plan's text which provides, with regard to third-party settlements, that "the Participant . . . must promptly pay to the Plan the **full amount received (regardless of how that amount may be characterized**

**and regardless of whether the Participant has been made whole)**." (Doc. # 22-1 at 47) (emphasis added).

Plaintiff's Response to Defendants' Motion for Summary Judgment fails to set forth specific facts from which a rational trier of fact could find that Sedgwick's actions were arbitrary and capricious. *See Adler*, 144 F.3d at 671. Specifically, her Response as to the third-party reimbursement claim is a total of two sentences long. *See* (Doc. # 29 at 5). In responding, she fails to provide any evidence to indicate she owes less than the full amount claimed by Sedgwick. *See* (*id.*). Nor does she substantiate her argument that Sedgwick's decision to enforce the Plan's provisions is somehow arbitrary or capricious. (*Id.*) Accordingly, Defendants are entitled to summary judgment on this claim. *See Admin. Comm. of Wal-Mart Associates Health & Welfare Plan v. Willard,* 302 F. Supp. 2d 1267, 1279-80 (D. Kan. 2004); *aff'd sub nom. Admin. Comm. Of Wal-Mart Associates Health And Welfare Plan v. Willard*, 393 F.3d 1119 (10th Cir. 2004) (finding that where plan provision provided that it could recover "any and all . . . payments" from "[a]ny judgment, settlement or payment," plan was entitled to reimbursement for entire settlement, "whether such payments are designated as payment for pain and suffering, medical benefits or other specified damages").

**B. DAILY FAILS TO DEMONSTRATE AN ABUSE OF DISCRETION AS TO SEDGWICK'S DEMAND SHE REIMBURSE THE PLAN TO OFFSET DUPLICATIVE FAMILY SOCIAL SECURITY DISABILITY BENEFITS.**

Defendants submit evidence that as of the date of their Motion for Summary Judgment, Daily owes the Plan $8,689.62 in past-due overpayments associated with her receipt of family Social Security disability benefits.[5] (Doc. # 22-1 at 35-36.)

Daily does not dispute that the Plan is entitled to reimbursement of this overpayment. Rather, she argues that a 36-month time limit to repay the Plan via reduced monthly benefits is arbitrary and capricious because neither the Plan itself nor the "Right of Reimbursement Form" she signed reference a 36-month time limit, there was a delay of "eight (8) to nine (9) years" before she was notified of this time limit, and Sedgwick allowed her only 33 days to repay the Plan in full.[6] (Doc. # 29 at 2-4.)

The plain language of the "Offset" provision of the Plan requires repayment of duplicative Social Security benefits. (*Id.* at 46.) Additionally, the plain language of the "Overpayment" provision requires that a participant repay any overpayments paid "for any reason," and that the Company "**may (but is not required to) make reasonable arrangements with the Participant** . . . for the repayment to the Plan for such overpayment, including (but not limited to) the reduction of future benefits." (*Id.* at 49.)

---

[5] This amount is lower than Sedgwick's initial calculation because Sedgwick has been reducing Daily's monthly benefits since 2009; accordingly, the balance in connection with this overpayment has continued to decrease during the pendency of Defendants' Motion. *See* (Doc. # 22 at 16, n. 7). Defendants indicate that they will file a notice with the Court confirming the actual balance due after the Court grants summary judgment. (*Id.*)

[6] In her response Daily also contends that the Defendants failed to provide facts indicating that the Plan uniformly applies the 36-month limit "to other similarly situated claimants." (Doc. # 29 at 3.) The Court disregards this argument because Daily has proffered no evidence indicating that she was treated **differently** than other similarly-situated Plan participants.

13

When these sections are construed with the Plan's provision of discretion to Sedgwick to adopt rules and regulations in administration of the Plan, it is clear that Sedgwick had full authority to adopt a policy requiring participants to pay any remaining balance on an overpayment within 36 months. *See* (Doc. # 22-1 at 48). Moreover, Daily signed a binding agreement that stated that she would repay the Plan "**immediately** upon receipt of a Social Security Disability or Retirement Benefit Award." (*Id.* at 39) (emphasis added). Accordingly, Daily's claims about a lack of notice of the 36-month limit ring hollow: far from evidence of arbitrariness or capriciousness, the fact that Sedgwick allowed her an additional 3 years to repay via reduced benefits actually constituted an **accommodation in her favor**. *See* (Doc. # 31 at 4) (noting that the 36-month period "is evidence of administrator recognizing a Plan Participants' need for additional time to comply with her obligations under the Plan"). Indeed, as the administrative record shows, Sedgwick ultimately provided Daily **almost 6 years** to repay the social security benefits she received before it took legal action.

Defendants' justification for the 36-month time limit is not only reasonable but sound. Defendants' Motion notes that, although Daily currently remains eligible for long-term disability benefits, "it has no way of knowing if her medical condition will improve such that she will be unable to receive benefits in the future," and that, if Daily is unable to receive benefits, "Sedgwick will have no recourse to recoup the overpayment to which the Plan is entitled." (Doc. ## 22 at 13; 31 at 3.) Defendants also note that the Plan itself contemplates the ongoing review of all disability claims by requiring Daily to periodically submit medical records to show she remains totally disabled. (Doc. # 31 at 3.) Daily counters that "given the length of time that Plaintiff has

14

been disabled, it is improbable [that] Plaintiff would no longer be eligible for future [LTD] benefits." (Doc. # 29 at 2.) However, Defendants need not prove that Daily will regain her ability to work at some point in the future in order to justify their demand for repayment after 36 months; they need only demonstrate that their actions were "grounded on **any** reasonable basis." See Kimber, 196 F.3d at 1098 (emphasis in original). Defendant notes that it is far more difficult for the Plan to recover overpayments from an individual who is not receiving disability benefits than it is to recover overpayments from someone who is receiving such benefits. Additionally, that the Plan requires periodic submission of proof of Daily's continuing disability underscores that Defendants' concern about her future ineligibility for benefits is a real concern – rather than one raised in bad faith. Sedgwick's actions are perfectly consistent with its responsibility as a named fiduciary to the plan, to protect the plan from significant financial losses.

In sum, Sedgwick's decision to enforce a 36-month time limit for repayment of the duplicative social security benefits was both reasonable and made in good-faith. Thus, Defendants are entitled to summary judgment. See Eugene S., 663 F.3d at 1130.

C. **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR COUNTERCLAIM.**

Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), provides that a civil action may be brought by a fiduciary to obtain appropriate equitable relief to enforce any provisions of an employee benefits plan. In 2006, the Supreme Court clarified that a benefits overpayment may be recovered by an employment benefits plan via equitable restitution under Section 502(a)(3) of ERISA, or via enforcement of an equitable lien by

agreement. *See Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 368 (2006). It is undisputed that Daily owes the Plan past due overpayments associated with her receipt of family Social Security benefits, as well as $23,296.60 in past due overpayments associated with the third-party settlement. Accordingly, the Court awards summary judgment on the Defendants' counterclaim.

## IV. CONCLUSION

Accordingly, it is hereby ORDERED that Defendants' Motion for Complete Summary Judgment (Doc. # 22) is GRANTED:

1. Plaintiff's claims against Defendants are DISMISSED IN THEIR ENTIRETY;

2. Upon Defendants' submission of a verified statement of the amount of overpayment still due from Plaintiff, which statement shall be filed within 14 days of this order, the Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiff in that amount, plus interest, if applicable.

3. Pursuant to D.C.Colo.L.Civ.R. 54.1, Defendants may have their costs by filing a bill of costs within 14 days of the date of this order.

DATED: October 29, 2014.

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge